Case No. 17-5095. David Pulphus, et al., Appellants v. Stephen T. Ayers, in his official capacity as Architect of the Capitol. Ms. Evanson, for the Appellants. Mr. Salson, for the Appellate. Good morning, Your Honor, and may it please the Court. My name is Kimberly Evanson, and I'm here on behalf of Appellates, Representative William Lacey Clay, and student artist David Pulphus. I'd like to reserve five minutes of my time for rebuttal. Government regulation of speech based upon listener reaction is the definition of an unconstitutional heckler's veto, and that is what happened here. Congressman Lacey Clay selected Untitled No. 1, a painting by student artist David Pulphus, as his entry in the Congressional High School Art Competition. The painting was displayed without incident with all the other winners for a period of about seven months, and then the Architect of the Capitol retroactively disqualified it from the competition, at the insistence of some other members of Congress who claimed offense at its perceived anti-police viewpoint. The only defense the Architect has offered is that the removal was government speech, and the District Court agreed. Before you get to that, could you talk about mootness? The most obvious relief you were seeking was rehanging of the painting during the period of the competition, and that's no longer possible. Yes, Your Honor. To begin with, it's the government's burden to show that there's no possibility that this court could offer any relief for the court to dismiss this appeal as moot. And the government hasn't argued that the case is moot. They've argued merely that they— No, the preliminary injunction appeal. Right. Which is all we have before us. Right. Why shouldn't we dismiss that piece of the case as moot? So there are several reasons you should not dismiss that piece of the case, Your Honor. First, the government's mootness argument is predicated on the fact that the disqualification from the competition is over, and that the only thing that happened to David and Representative Clay was that the painting was removed from the wall. But that isn't all. The painting has been disqualified from the competition. David is no longer a winner. So the benefits that flow from being a winner are no longer provided to him. There are multiple declarations in the record that detail the harms that appellants experience and continue to experience as a result of the viewpoint-based disqualification. It's the architect of the Capitol— —maintained by a third party who's not before the court, and the reputational injury. So the website is one of the harms, yes, Your Honor. And it's the architect, actually, that testified in his declaration. Those are the two theories, right? Well, that there are— To overcome moot. Those are the two injuries that you say are continuing and can still be redressed. Well, Representative Clay also has a continuing challenge to the suitability guidelines, which he is still subject to, which is still ongoing. Which is not part of the P.I. appeal. Well, Your Honor, it is part of the P.I. appeal. We argued before the court as a basis for our preliminary injunction that the suitability guidelines were unconstitutionally vague. The government argued they were not, and the court ruled that the appellants had no First Amendment rights, and so it didn't have to reach the issue. So can we just go through them one by one? Reputation. We said in McBride that if you have an otherwise moot government action and harm to reputation flows from that as a secondary effect, that's not enough. So I— To the extent you're challenging kind of what you call the disqualification, as opposed to the failure to put the painting on the website, why isn't that enough? It seems highly akin to the suspension in McBride and the period ran, and he says, well, the case is live because my reputation is still harmed, and we said not enough. So in McBride, though, there was also an unexpired public reprimand that the court found was enough to continue to be challenged, even though the suspensions themselves had expired. Right, which was still on some court or other website, which is analogous to your second theory about the painting not being included in, what is it, Congressional Institute's website. Yes, Your Honor, they're all bound up together, is that the disqualification remains. It's the architect of the Capitol who testified in his declaration that one of the benefits of being a winner of the competition is that the art appears on this virtual gallery. And if the court looked at the virtual gallery that we've included in the record, just the screenshots showing every year of Missouri's entries, and that's a JA 604 to 608, it shows the first district of Missouri is there. Until you get to 2016, it's not there. Right, but this is the first time something like this has arisen, which is the member picks the painting that the member wants hung, and the architect makes a suitability determination. And how do we know that the painting was removed from the website because of the suitability determination, rather than because some very high profile people were leveling some very substantial criticisms of the painting? So we know that the painting was removed from the website because it was on the website up until the point that the architect issued its disqualification. And up until the point that the Speaker of the House started very publicly saying this painting is an outrage. Yes, Your Honor, the Speaker of the House did say that, which we posit is... And could continue to say that if we were to rule in your favor, there'd probably be another outcry. And the people who maintain this website who are not before us would have to make a decision whether or not to repost the painting, an image of the painting. And how do we know that they would? Well, Your Honor, it's not certain that they would, but the Supreme Court has said that certainty as to a particular avenue of relief is not required in order to defeat mootness. And this Court has said that when a legal error is made in the denial of a preliminary injunction, that this Court will review that legal error and correct it so that proceedings below can proceed under the proper standard. And that's what we're asking this Court to do today. Doesn't it have to be likely that the private actor will respond in some way to our opinion? So, Your Honor, I want to clarify that the relief is not merely bound up in the reinstatement on the website. It's the architect who testified. That's a benefit that belongs to the winner. But David also testified that he doesn't believe he can put this on his resume anymore. He feels that the disqualification lasts. I understand, but do you mind going back to that question? Don't you have to show it's likely? With respect to that particular injury, don't you have to show it's likely? I don't believe we have to show it's likely. Isn't that what we said in Teton? In Teton, we said very likely, actually. Teton did say very likely, Your Honor, but Chafin, the Supreme Court in Chafin, said that we don't have to show certainty. But again— Was that a private actor, a separate private actor? Excuse me? Was that a separate private actor? They were talking about the actions of a non-party in that case. No, they were talking about the possibility that the party before the court, subject to the court's order, might disobey it. And they said that possibility is not enough to defeat mootness. Your Honor, I would like to respond by saying that the injury that Rep. Clay and that David assert is redressable, ultimately, by an order from the district court or this court that what happened to him was wrong. And that's what this court said in Foretich. And whether or not—we don't have any reason to believe that the painting would not be returned to the website, but that's just one incident of being a winner in the competition. So while we would certainly hope that the Congressional Institute would follow a court order that said the exclusion was unconstitutional, we would not—it's not necessary to—a finding at this point in the proceedings is not necessary in order to rule that the case remains live. Turning to the government speech issue, what the government has to show is that in order for the First Amendment not to apply, is that the very narrow doctrine of government speech controls the medium, the history, the purpose of whatever the government is trying to say. Now the purpose of the government speech doctrine, as the Supreme Court just said in Mattel, is to enable the efficient—to enable the government to speak efficiently and without its message being garbled. So we have to start with the threshold question that was articulated in Rosenberger, which is, is there intent of government to deliver a message? Or, as is the case here, is the government creating a program or a forum by which other private speakers are communicating? If we look at the history of the competition, we don't see any intent to communicate a message on behalf of the government. We see a forum. The purpose of the competition, as stated in the record, was to give members the opportunity to showcase their constituents and to give their constituents the opportunity to showcase their creative talents. There's nothing in the record that suggests that the government was intending to communicate a specific message. And the second factor, under the Sumer and Walker cases— Before you get to the second, on the first factor, context matters. And the context here is the private space in a government building. Doesn't that cut against you? So, Your Honor, we don't believe it cuts against us because— to showcase the speech of private parties in a part of the Capitol that private parties can't ordinarily access. So, I have a few responses to that. First, private parties actually can access the Cannon Tunnel. It's the architect who's described the Cannon Tunnel as highly traveled. Second, if the inquiry was based just on government control of government property, then that would implicate all, even public forum cases with courthouse squares and Capitol steps, that the court has said mere government control is not sufficient. But also, the Cannon Tunnel is open to thousands of Capitol visitors and staff and the members themselves. Part of this forum is a forum for members to express and celebrate the talents of their constituents. I swear I just thought of this just now, but looking out at you and this courtroom and all the people here, so individual judges decide which portrait artists they want on these walls. And thousands of people come in the public, come and look at these walls. If the court—if one of the judges selected a portrait that the rest of the judges thought was too controversial, they didn't like it, or for any vague reason, and they decided, sorry, we're not going to accept this, would that violate the judges' First Amendment rights? That's the argument you're making about the member of Congress here, right? Well, Your Honor, it would depend, of course, on how the judges had set up the— It would depend on—so if the judges had said, we're going to generally leave it to individual judges to make this decision, but we retain ultimate control, and we've never previously exercised that control. But we did it for the first time, say, on Judge Garland's portrait. Would that be a violation of Judge Garland's constitutional right? Well, Your Honor, it would depend on whether— if you're going toward a government speech analysis, whether the government was intending to send a message through those forums. So you think it's quite possible—it is possible that my constitutional right to put any kind of portrait I want on the wall would be affected. Your Honor, if there was— That is the implication of your argument, isn't it? It is a far-reaching implication of our argument, but I don't think it's necessary to rule in our favor, because here we have clear evidence that there was a forum for member speech and that this particular painting was removed on the basis of its viewpoint. Was the member acting in his, in this case, personal capacity or in his capacity as a member of Congress? Well, Your Honor, there are two answers to that question, and I actually don't think it's dispositive. But the member, of course, had to be a member of Congress to participate in the forum. So he was a state actor? No, Your Honor. He was speaking in his own personal and political capacity in making this choice. Well, political capacity is fine, but that arises out of his being a member of Congress. If a member of Congress acts, they're acting as a state actor, aren't they? Well, Your Honor, not every speech statement made by a member of Congress is government speech. Where they're delegated the authority to do something by a larger body of the Congress, which obviously occurred here, right? He didn't just do it on his own. He had authority to do this, right? Sure. The Congressional Art Competition is a tradition among members, and they all participate, and they have the opportunity to submit a painting. So in that capacity, he was acting as a government official? In that capacity, sure, he was acting as a member of Congress, but that's not the question under the government speech doctrine. And this question actually gets to... Before you get to that, let me just ask you another hypothetical. Could he, this congressman, exercise viewpoint discrimination in deciding which painting he would put up as his district's painting? So, yes, we believe that he could. Because it was government speech? No, because the member is acting, well, for two reasons. One, the government speech, the only government speech that the government has alleged here is that the speech of the architect is the government speech. And he has the power to control whatever the government's message is. And so... But under your theory, the competition is a forum. And that seems to necessarily imply what the chief judge was just asking you, that he can't, he is making all of these decisions with no guidelines, which you would need for a forum. He's perfectly free to viewpoint discriminate. And that's the necessary implication of your theory. But even if the court determined, and we don't have an adequate record to know how all these members are making these different determinations, even if the court determined that that district-level decision was somehow consistent with the government speech doctrine, that doesn't mean that the National Exhibition is. We still have to ask the questions articulated by Mittal, which are, would a reasonable person believe that the government is speaking and sending a message through this medium? Has the government exercised editorial control? Or, as in our case, is the government acting to restrict minority viewpoints? I see that I'm out of time. That's okay. Can I ask you another hypothetical? Of course. Suppose Representative Clay wants to decorate his own office. And he thinks it would be a nice gesture to his constituents to have one wall in the office dedicated to artwork by his constituents. And he solicits people to submit. And he says, I will display my ten favorite ones every year. Can he? Does that make his office, does that make that what I've just described into a non-public forum? No, Your Honor, it doesn't. Okay, how is this different? Is the government doing exactly the same thing in its private space of its own buildings? It is different in several crucial respects. And the PETA case from this court actually helps us to determine that. In PETA, this court ruled that when the District of Columbia set out to communicate a message about the district, it decided to form a commission to sponsor and commission a particular piece of art, an exhibition, that showed the fun side of the District of Columbia. And so in doing that, it decided the best way to communicate that message about the greatness of the District of Columbia and its fun and whimsical side was to decorate donkeys and elephants. And it solicited designs and it accepted only the few that it believed best communicated that message. The distinction that you're getting at is whether government control of art is government art for government purposes. The amicus brief explored the difference between commissioning a piece of government art for government purposes.  So let's say, just to clarify the hypothetical, he can only select a small percentage of submissions. He's got two spaces on the wall and he gets 20 submissions. Which is fine, again, Your Honor, because the locus of control over the display is starting and ending with clay. Here we have the exact opposite. We have a forum for members. You have clay acting as, I don't know what you would call it, the curator. He is selecting the one piece of art from all of the submissions that are coming into him from his district, and he is saying under completely standardless, viewpoint-based, whatever standards he wants, he's saying this is the one that I, you know, qua curator, want to put up. So clay is doing that, but there's no evidence that the architect has done that. The arts patron cases, where the government... But that is part of, that is the essential first step of the process by which these paintings are selected. And so to come to the third element, which is control, you say there's essentially none by the architect, and that may or may not be right, but there's a lot of control and selectivity by the individual members. That's true, Your Honor, but the way the government has argued the government speech defense, it can't be that selection of content by a government official on government property means it's government speech. That would collapse every First Amendment case that we have. Not by itself, but it goes to how the control factor, whether it cuts for you because the architect isn't doing so much, or against you because the representatives are doing a lot of control. And this hypothetical demonstrates why the government speech doctrine is such a bad fit for this program. A program, the Second Circuit just articulated Rosenberger by saying, a program which by its very design is intended to encourage and facilitate a diversity of views is not government speech, even if the government is funding it and supporting it. Here we have the architect had never exercised any curatorial discretion. So any deference that the court has typically afforded to curators or librarians in those specialized roles, that deference comes from the fact that, one, they're assumed to be exercising certain professional standards, as Amaki explained, that are inherent in art curating or being a librarian or being a journalist. For that reason, the government defers. But even in those cases, the government warns that discretion is cabined by viewpoint discrimination. Finley said it's okay for the government to have vague standards in art because we understand there are subjective determinations like excellence and merit that go into the award of NEA grants. But they said if there was actual evidence of viewpoint discrimination, this would be a different case. That wouldn't apply to a government art museum, though, would it? Well, Your Honor, it may. There are several district court cases that held that the government can't just pull out art it finds offensive out of an art museum just because it receives government funding. What about what we said in PETA about exactly that point? Did we say that that is government speech? Yes, Your Honor. What PETA said, and the conclusion of the opinion says, as a speaker and an arts patron, in PETA, the locus of control over the exhibit started and ended with the government. That's a different situation than, say, for example, the Brooklyn Museum case, where the museum received some funding, and then the mayor of New York wanted to pull an exhibit because he found it personally offensive, and the court said that's not okay. Our First Amendment jurisprudence in the arts doesn't say every time the government is involved in arts, it's government speech. Let me just read our First Amendment jurisprudence from PETA since you brought up the case. Suppose that instead of placing the elephants and donkeys on sidewalks and in parks, the government placed them in one of the district's public buildings. There could be no persuasive argument that the First Amendment would prohibit the commission from engaging in viewpoint discrimination when it decided which designs to accept and which to reject, the hypotheticals indistinguishable from a government art museum. And from this case, it should make no constitutional difference that they were in an outside art exhibit or that some were placed on private property. And that's correct, Your Honor. We wouldn't disagree with that point of view. Again, this distinction articulated in PETA and what we have here, or say PETA versus the Wandering Dago case recently decided by the Second Circuit, is that in PETA, again, it was a government-commissioned, controlled exhibit. And so if in that case the government was referring to a government museum where the government said we are going to honor these particular folks from this chapter in history, that's a different situation than what we have here. What we have here is the government opening a forum. Now that forum is limited, and it's subject to reasonable limitations on identity of speaker. But in even a non-public forum, our Constitution forbids viewpoint discrimination, precisely for what happens here, the chilling of minority views. The question is whether it's a government forum or not, whether it's a forum or whether it's government space. That is the question in this case, Your Honor. Let me ask if anybody else on the panel has questions. Thank you. May it please the Court, Josh Salzman on behalf of the Architect. I'd like to begin with the mootness argument. And frankly, many of the points I would have brought to the panel's attention have already been well aired during the first half of this argument, and I won't reiterate them here. But there are a couple of facts I'd like to highlight in particular that I think emphasize why this case is moot and the Court should not reach the merits here in Black's jurisdiction to reach the merits. One thing I want to emphasize is the narrowness of the Architect's decision, which you can see memorialized at page 400 of the joint appendix. Opposing counsel was up here and told you that this was a decision that disqualified the painting. But if you read the painting, if you actually read what the Architect did here, it's a very narrow decision that simply says, I have determined this painting does not meet the suitability guidelines and I'm having it removed from the wall. There's no official record of the competition that's maintained by the Architect from which this painting was stricken or removed. So as a result, I think to the extent that their preliminary injunction request could be read as anything broader than a request to simply have the physical painting put up on the wall, all they said is the Architect's decision should be reversed. All the Architect's decision really said is the painting should come off the wall. There was no instruction to the Congressional Institute to take this down. And as was suggested earlier, it's entirely speculative how the Congressional Institute would respond to any decision that this Court made, particularly in a preliminary injunction posture that wouldn't decide the ultimate merits but merely would express a view of likelihood of success. I don't understand what you mean by saying it wasn't disqualified. What does that mean? It was no longer qualified to be hung on the wall, isn't it, right? That's true, Your Honor. It had to come down off the wall. But I took opposing counsel to be— And why did it have to be taken down off the wall? Because it did not—the Architect had determined it didn't comply with the suitability guidelines. Qualify under those guidelines. Is that just another way of saying the same thing? I don't understand the quibble over the word qualification. I don't want to put too much emphasis on the word qualification. What I want to emphasize here is there wasn't an instruction that the painting should be removed from some public record, that Mr. Pulvis, for example, was prohibited from listing this on his resume. He is still free to list the true fact that his painting was selected by Representative Clay for inclusion in this competition. That's the only point I'm trying to make here, Your Honor. The other thing I want to emphasize, to the extent that we're talking about reputational harm here, and I think Judge Katz has already quite rightly emphasized the key language from the McBride opinion, but the other thing I want to say is that the decision here was not itself particularly stigmatizing. In the past, what you've been talking about in McBride was a censure. In Fortich, it was a finding that the individual had sexually abused his daughter. Here, what we have is simply a finding that the painting did not meet the suitability guidelines, and I note that those suitability guidelines exclude subjects of contemporary political controversy. There's nothing inherently stigmatizing in having one's work described as portraying a contemporary political controversy, and in fact, plaintiffs freely admit that that's precisely what this work was. So I think for that reason as well, and for all the reasons that were brought up earlier, this court really can't get past the mootness issue. But if there are any questions on mootness, I'm happy to address them. I'm also happy to address the merits, but of course the court can't reach those unless it finds the mootness overcome here. We don't have to do that during this oral argument, so I expect it to be a good idea for you to keep going. Okay. I'd be happy to, Your Honor. So I think that what makes this—I think there are a couple of reasons that the holistic assessment of the facts here yields the conclusion that it's government speech. But particularly telling is the fact that a member of Congress acting in their official capacity has to make the selection, and when they make that selection, they have to sign a form—this is at JA 389—that says that they approve of the work, that they support its content, and that they're responsible for it. The fact that a government actor needs to take those steps, and is free, by the way, to engage in, as my opposing counsel conceded, any form of viewpoint discrimination in the course of making their selection, I think distinguishes any kind of art competition or any of the other concerns. Would anyone in their right mind, the reasonable observer, looking at that exhibit, which is a whole series of very different paintings, think, oh, this is the position of the United States House of Representatives? And that painting stands next to one that, you know, someone holding a flag and stands next to, whatever, a pretty picture of a flower or something. I think the relevant question is would they think this is a government-compiled and curated exhibit. I'd push back strongly on the notion that you need any kind of coherent or single message for government speech to apply. Well, except that in Mattal, in finding no government speech, the court said, gosh, if this were government speech, the government would be babbling incoherently. That's true, Your Honor, but I'd point out a few things about Mattal. First, Mattal did not purport to overrule Walker or Sumam, and I don't think can be seen as disturbing this Court's holding in Gaines. How would you reconcile the babbling license plates, some of which say go Texas and some of which say go North Carolina, and the babbling trademarks, some of which were completely inconsistent with each other on political and other grounds? How do you reconcile those two Supreme Court cases? Sure, Your Honor. Well, first of all, I note that Tam specifically preserved Walker, just described Walker as the outer perimeter of the First Amendment. That doesn't reconcile them. That just says one is the outer perimeter but doesn't explain the perimeter. So the two factors that made Tam very different were, first of all, that the PTO had a decision going back to 1993 that expressly disclaimed any government imprimatur. But they also had a statute which said don't license, I forgot the exact, things that are offensive, right? So it seems structurally similar in that you have, if you're comparing the PTO to the architect, very liberal range of permissible subjects and they're doing a screen on the outer bounds for things they find offensive. So what Justice Alito highlighted in Tam was the fact that here you had a government program that mandated, there was really no selectivity. You had some very broad criteria and any of the hundreds and hundreds of thousands of trademarks that met those criteria had to be registered. Section 2A of the Act. Right, but you had an express reservation which was written into the statute saying we will not accept offensive marks. But you had the lack of exclusivity, you had the lack of culling that you have in a case like this, for example. Member Clay received 37 submissions and he picked one. So I think that that makes that very different from a situation where the US PTO is generally taking trademarks, assessing them for things like genericness, are they descriptive, are they confusingly similar to other marks, as opposed to a situation where you have a member who is a government actor, acting in an official capacity, who is selecting one work to represent him and then putting his name on it and saying that he approves of it and supports it, which is very different, of course, from what the PTO was doing there. I'd also note that the government, TAM says what it says, but it is worth noting that the government in TAM itself made government speech, did not make a leading government speech argument. There was certainly discussion of Walker. What the government's argument was is that TAM implicated the same concerns as Walker, but we always understood that the kinds of situation we were dealing with in TAM was very different from the kinds of situation in a case like Gittins, which far more closely resembles this case, when the government is selecting art for display, and indeed here, selecting the art for display in a government building, in a restricted area of a government building. The other thing I want to push back on for purposes of the government speech argument is this notion that the architect has wholly abdicated control here. I think it's important to bear in mind, in assessing this, that there's a structure of power that runs through this, and there's a delegation of authority. That delegation starts with 2 U.S.C. 2001, which vests in the architect control and supervision over the relevant areas of the Capitol and the House Office building, and that the architect then, for these purposes, acts under an entity known as the House Office Building Commission, which is composed of the Speaker of the House and 2 other members of Congress. Now, back in 1981, the House Office Building Commission authorized the Congressional Art Competition, but at that time, from the very get-go, they were very clear that they did not want to create some kind of open public forum for speech. What Speaker Tip O'Neill said at that time is, we need to make sure the dignity of these halls are assured, so we need a check-in place. A professional jury needs to be ready to screen these. We are making a delegation of authority to members to make selections, but that's always going to be subject to the oversight of the architect. Now, in the years since, the architect has, in the district court's words, kept a light hand on the reins, but the rules have always made clear that there's going to be a suitability determination. Every year, the architect has continued to review those paintings. The architect hasn't just given up the task. The architect has flagged works that are potentially unsuitable and has, in the past, generally deferred to members, but sometimes members have withdrawn works that the architect has flagged and has recognized that maybe those aren't suitable. There's also nothing— But that can't be enough, right? I think it can. It can be in combination with the other factors, Your Honor, if I may. I mean, take Rosenberger, right? Can the government say, we want to have a newspaper and we want to solicit student articles, but you know what? Those pesky religious articles we think are not suitable. So that's what we're going to do. I mean, that is Rosenberger pretty closely. That is Rosenberger, and forum analysis and the prohibition against viewpoint discrimination was applied. That's certainly true, Your Honor. I think it depends how the program is set up, obviously. This is a context-specific analysis, but here you have a program where— The other thing I want to highlight is the fact that there's a declaration in the record from the curator of the Architect of the Capitol who explains that since the advent of email, what you have are members sending images of the works in advance, before the selection, so that they can get sort of preliminary views on the suitability of the works. Now, it's not going to be visible in the same way as a post hoc disqualification, but that's another way that the architect influences the decision, and it's very sensible that they do it that way because you want to avoid precisely the situation you have here. You want to avoid a situation where a painting is taken to Washington, a student is invited, and then suddenly it's decided it's unsuitable. So there's behind-the-scenes things that happen in advance of the selections through which the architect helps guide people towards suitable choices. Throughout, the architect has never disclaimed the authority to make the selections and ultimate authority to decide what is and is not suitable. But, of course, the architects—I think it's quite right to recognize that they can't skip over the first step, which also, I think, makes this an even easier case, because you have the member of Congress acting in an official capacity making those selections. Questions? Thank you. Is there any time left? Maybe an extra two minutes. Thank you, Your Honor. I just want to follow up on a few brief points. So as this court recently ruled this summer in the WMATA cases, the court said that we have to look at the actual practice of the government to see what has happened to evaluate whether its restrictions are reasonable. And as the Supreme Court just recently ruled in Mansky, there has to be a sensible way, when you're looking at restrictions on speech, of telling what is in and what is out. Now, responding to counsel for the government, he just said that the declaration in the record suggested that there was some sort of pre-review happening. And what the curator said is that since the advent of e-mail, they're available for those options, but there's nothing in the record that says she has exercised that to say that a member cannot support or sponsor their chosen work. To the contrary, the only thing the curator put in the record was the instances where she or the architect has deferred in the past to members. The year that David's painting was disqualified, there were two paintings that were flagged, only two, as potentially unsuitable, neither of which was David's. And the architect contacted those members and said, do you still want to sponsor this painting that depicts bullet holes in a young boy's body? And the members said yes, and they said okay. And it was the same answer with respect to the painting of Bob Marley smoking marijuana. And so it can't be that every time the government simply interacts with art, that it becomes government speech. What the government is asking for here is a dramatic expansion of the government speech doctrine and affirming the district court on this record would be tantamount to ruling that whenever the government is tangentially involved in art in any way, through a fund or a program, no matter how diffuse, that the government is speaking and the First Amendment does not apply. That is contrary to the Supreme Court, and that is contrary to our most sacred principles. That would require us, if we were to rule against you, to be tantamount in the way you said, that we wouldn't mention that it was in the Capitol, we wouldn't mention that it was in the tunnel, right? In the way you just put it, anything the government ever does, even the most tangential way, if we were to rule against you, I'm pretty sure we would mention the fact that the paintings are put inside the U.S. Capitol. Of course, Your Honor, and that's one of the factors that has to be considered. But this court in the past, and district courts in this court, have applied the forum analysis to the interior of the U.S. Capitol. That's Washington Activity Group v. White and the Bynum case, which is cited in our materials. Also, the Supreme Court has said, if there's a concern about perception, there are two ways to remedy that. In Panett, Justice Scalia said, put up a disclaimer. That is a much more reasonable option than prohibiting speech. And in Rosenberger, the court said, the best way to guard against perceived viewpoint discrimination is to be viewpoint neutral. And that is what the court should rule here, is that the government has created a forum for member speech. It has welcomed a diverse and expansive collection of art, as Judge Katz has pointed out. Every topic imaginable is covered by these paintings. You have racism, family, immigration, violence, history, policing, police brutality. David's painting was not the only painting that arguably touched on that subject. And yet, what we have here is the singled-out exclusion of one painting on the basis that it offends. The court has recently reaffirmed again in Mittal, giving offense is a viewpoint, and it is protected by the Constitution. Are there further questions? Thank you. We'll take the matter under submission. While the next case moves up, if you'll give us a brief recess. Thank you.
judges: Garland, Rogers, Katsas